184 N.J. Super. 355 (1982)
446 A.2d 193
H.P. HIGGS COMPANY, INC., PLAINTIFF,
v.
BOROUGH OF MADISON, A MUNICIPAL CORPORATION, DEFENDANT.
Superior Court of New Jersey, Law Division Morris County.
Decided January 27, 1982.
*358 William C. Slattery for plaintiff (Rosen, Gelman and Weiss, attorneys).
Herbert A. Vogel for defendant (Vogel and Chait, attorneys).
BANGIOLA, J.D.C. (Temporarily assigned).
This is an action in lieu of prerogative writs brought by plaintiff H.P. Higgs Co., Inc., and against the Borough of Madison, a municipal corporation of New Jersey, in which plaintiff *359 alleges that the provisions of Ordinance 31-80 are invalid and that the rates established by the said ordinance are arbitrary, capricious and discriminatory.
Madison operates a municipal electrical utility pursuant to the provisions of N.J.S.A. 40:62-12. It operates the utility solely within its geographic limits and is therefore not subject to regulation by the New Jersey Board of Public Utilities (BPU).
Madison buys all of its power at wholesale rates as regulated by the Federal Energy Regulatory Commission (FERC) and delivers energy through substations in a distribution system of transformers, poles and lines, all of which are owned by the borough. The tariffs or price at which Madison sells electricity to its consumers is not regulated by either the BPU or FERC. Madison has generally in the past followed Jersey Central Power and Light Company (JCP&L) rates in charging its customers. As a result of following those rates the municipality has realized a significant surplus and, in a sense, a "profit" by way of excess revenues over the cost of power as compared with the revenues realized from the sale of power or energy. These excess revenues have routinely been transferred to the general fund of the borough. In addition to surpluses provided by the electric utility operation, there were payments made in lieu of gross receipts taxes which have been carried as an expense of the utility. Transfers of funds from the utility from 1977 through 1981 were as follows:

 1977 1978 1979 1980
Anticipated Surplus $340,000 $115,000 $389,000 $293,000
"In Lieu of" Payments 291,000 360,000 370,000 395,000
 ________ ________ ________ ________
 TOTAL $631,000 $475,000 $759,000 $688,000
 1981
Actual Surplus $536,232
"In Lieu of" Payments 425,000
 ________
 TOTAL $961,232

*360 Historically, previous governing bodies (prior to those in power at the time of the enactment of Ordinance 31-80) followed the JCP&L rates.
Subsequent to the institution of this action defendant employed H. Zinder and Associates to make a study of the rate structure of the utility. Pursuant to the recommendations of the Zinder report and the experts employed by that company, Ordinance 39-81 was enacted.[1]
The testimony in this matter was extensive; exhibits totalled 50 for plaintiff and 26 for defendant. A variety of reports and briefs were submitted which are all part of the record and were considered in the rendering of this decision.
The Madison electric utility is expressly authorized by statute. N.J.S.A. 40:62-12. The borough council is empowered to establish by ordinance the rates to be charged for supplying electricity. N.J.S.A. 40:62-13. Since the borough's electric utility does not supply electricity beyond its corporate limits, the Madison Electric Department is not considered a public utility and is therefore not subject to the regulatory jurisdiction of the Board of Public Utilities. N.J.S.A. 40:62-24. See, also, N.J.S.A. 48:2-13; In re Glen Rock, 25 N.J. 241 (1957) (BPU jurisdiction does not encompass municipal corporations); Jersey City Incinerator Auth. v. Public Utilities, 146 N.J. Super. 243, 253-54 (App.Div. 1976).
Substantial differences exist between the approach taken in reviewing a proposed rate increase by the BPU as contrasted to that employed by courts reviewing a challenge to a rate fixed by ordinance for the services rendered by a municipal utility. To begin with, a privately-owned utility in a rate proceeding before the BPU has the burden of proving that the increase is reasonable. N.J.S.A. 48:2-21(d). N.J. Bell Tel. Co. v. Public *361 Utility Comm'rs., 12 N.J. 568, 585 (1953); In re New Jersey Power and Light Co., 9 N.J. 498, 526 (1952); Central R. Co. of N.J. v. Public Utilities Dep't, 7 N.J. 247, 255-257 (1951).
By contrast, a presumption of reasonableness and validity attends municipal enactments. Collingswood v. Ringgold, 66 N.J. 350, 358 (1975); Moyant v. Paramus, 30 N.J. 528, 534 (1959); Dock Watch Hollow Quarry Pit v. Warren Tp., 142 N.J. Super. 103, 116 (App.Div. 1976), aff'd 74 N.J. 312 (1977). A court's role in reviewing the exercise of a municipal function is narrow and limited. Dock Watch Hollow Quarry Pit, supra, 142 N.J. Super. at 116; Rudderow v. Mt. Laurel, 121 N.J. Super. 409 (App.Div. 1972). Courts will interfere with the presumption in favor of municipal action only upon an affirmative showing that the action was arbitrary or unreasonable. The burden of proof is upon a plaintiff to demonstrate such unreasonableness. Dock Watch Hollow Quarry Pit, supra, 142 N.J. Super. at 116. See, also, Rudderow v. Mt. Laurel, supra, 121 N.J. Super. at 415; Bellings v. Denville Tp., 96 N.J. Super. 351, 356 (App.Div. 1967).
This standard of unreasonableness governs the instant case. In determining whether plaintiff here has met its burden, the court is obligated to inquire into the appropriateness of those factors raised by plaintiff and in fact used by the borough in establishing its utility rate. These factors include: (1) Madison's adoption of Jersey Central Power and Light Company retail rates for residential and GS secondary class customers; (2) accounting methods used in computing the utility rate base and (3) the right of the utility to earn a profit, which may be transferred to the general fund of the municipality.

I
Madison has defended its policy of following the JCP&L retail rates on grounds of administrative convenience and maintaining parity with surrounding communities. In support of its contentions Madison presented the testimony of its expert witness, Jack Sanders of H. Zinder and Associates. Mr. Sanders *362 stated that in his opinion sound reasons support the Madison council's practice of following the retail rates of JCP&L. He stated that under this practice the resultant rates are better understood by the residents of the community. Moreover, the rates for larger utilities are generally set by regulatory authorities, insuring their fairness. Sanders also stated that the practice of adopting the retail rates of larger utilities is reasonable where the larger utility is the power supplier of the smaller municipal utility.
None of these reasons are sufficient to rebut what is inherently an unreasonable method of establishing a utility rate. In the first place, it is settled that rates may not be justified as reasonable based on a comparison with rates in surrounding areas. Crowe v. Sparta Tp., 106 N.J. Super. 204 (App.Div. 1969). Nor may rates be justified merely because they are easier to understand. The reasonableness of rates is more properly judged as a function of cost. The cost of power supplied to the municipality is based upon a wholesale rate, set by the Federal Energy Regulatory Commission. The cost of power supplied to retail customers of JCP&L (and customers of the borough as well) is based upon a retail rate, set by the Board of Public Utility Commissioners. While these rates may reflect costs to JCP&L in supplying power to its customers, there is no necessary connection between the wholesale and retail rates in terms of costs to the Borough of Madison sufficient to justify its adoption of the retail rate. Since Madison's costs reflect the wholesale rate, any differential between the wholesale rate and the retail rate simply accrues to the municipal utility irrespective of cost. By adopting JCP&L's retail rate structure, Madison has based its own utility rates, not on cost but on convenience. Such a practice must be held to be unreasonable.
The unreasonableness of this practice does not imply, however, that the borough has somehow specifically discriminated against plaintiff or the GS secondary class of customers. Indeed, plaintiff has failed to carry its burden of proving such *363 discrimination. The rates are unreasonable, but not any more so for plaintiff than for other purchasers of electricity within the borough.

II
N.J.S.A. 40:62-2 provides that "any municipality" engaged in operating a "light, heat or power plant" which provides such a service only within the limits of the municipality[2]
... shall with respect to such business and the property and plant used by it ... keep its books, records and accounts in the same manner as provided by statute for keeping other books, records and accounts of a municipality and file with the Board of Public Utility Commissioners a copy of its Annual Report of Audit....
The clear import of N.J.S.A. 40:62-2 is that, with respect to the "business and the property and plant" of the Madison electric utility, the borough must keep its books in accordance with the Local Budget Law, N.J.S.A. 40A:4-1 et seq., and the Local Bond Law, N.J.S.A. 40A:2-1 et seq. Madison may not ignore municipal accounting in the establishment of rates for electric service within the borough.
The Local Budget Law requires that "[t]he budget of each local unit shall be prepared on a cash basis unless otherwise permitted by law." N.J.S.A. 40A:4-3. A "cash basis budget," as defined by the statute, is a budget prepared in such form as to provide that
... there will be sufficient cash collected to meet all debt service requirements, necessary operations of the local unit for the fiscal year and, in addition, provide for any mandatory payments required to be met during the fiscal year. [N.J.S.A. 40A:4-2]
The Borough of Madison and the Madison electric utility are required to abide by these provisions.
Consequently, although the power to fix rates to be charged for supplying electricity is by statute given to the borough council, it may not establish or justify the rates to be charged in *364 derogation of the accounting principles imposed upon New Jersey municipalities by the New Jersey Budget Law.
The revised 1979 and 1980 reports submitted to the BPU pursuant to N.J.S.A. 40:62-1 purport to establish a rate base for the Madison electric utility based upon the replacement cost new of the utility's plant and property. The valuation of the utility plant, as stated in the revised 1979 BPU report, is $11,275,200. The valuation of the utility plant, as stated in the 1980 BPU report, is $12,257,600. These figures are based upon a study performed for the borough by H. Zinder and Associates. They stand in stark contrast to the figures found in the borough's audit reports for the same period. The 1979 audit report places utility plant valuation (before amortization) at $4,268,060. The 1980 audit report valuation is $4,288,022. These figures are based upon the books and records of the borough and reflect the original cost of assets as funded through the issuance and sale of bonds, plus the initial investment of the municipality.
The net utility plant figures for the above reports are:[3]

 BPU Annual Audit
 1979 $9,197,700 $1,407,173
 1980 $9,639,300 $1,304,233

*365 The rate base which is used to calculate the rates charged to customers is derived in large part from the net utility plant figures quoted above. The rate base, as computed in the Zinder Report, is $9,888,700. The rate base, as computed by plaintiff's expert, Jamshed Madan, is $1,633,944. The rate of return to the utility for 1981 (net revenues divided by rate base), as determined in the Zinder report, is 3.29%. The rate of return for 1979, which used the latest figures available to Madan, was determined by him to be 45.22%.
The reasonableness of a rate base is a function of cost. Cost, for a municipally-owned utility, has by statute been mandated to include at least three factors: (1) operation and maintenance expenses, (2) interest and debt retirement and (3) deferred charges and mandatory statutory expenditures. N.J.S.A. 40A:4-34 and N.J.S.A. 40A:4-2. The statute does not state that a municipal utility may include replacement cost in determining net plant valuation.
Madison attempts to legitimize its figures by reference to a standard applied by the courts and by the BPU to publicly-held utilities. Madison claims that rate bases for these utilities are calculated in terms of the "fair value" of the property and plant of the utility. As stated by Chief Justice Vanderbilt in Public Services Coord. Transport v. State, 5 N.J. 196 (1950), with respect to the establishment of a rate base:
The rate base is the fair value of the property of the public utility that is used and useful in the public service ... a utility is entitled to a just return upon a fair value of the property at the time of its employment for the convenience of the public. [at 217]
However, Madison incorrectly equates fair value with replacement cost. There is no requirement that a rate base be coupled directly to cost of living indices, or current costs in materials and labor markets. N.J. Bell Tel. Co. v. Public Utility Comm'rs, 12 N.J. 568, 586 (1953). Reproduction cost is one guide to fair value, but is not a measure for determining the fair value of public utility company's property used and useful in the public service. In re Plainfield-Union Water Co., 57 N.J. Super. 158, 176 (App.Div. 1959).
*366 Thus, even if this court were inclined to consider BPU rate base formulations, Madison's reproduction cost figures would not by themselves constitute a reasonable foundation upon which to calculate a rate base.
This is not to say that replacement cost is not a factor to be considered by the borough in establishing a rate base. Such information, when used as a supplement to original cost/cash basis accounting, may prove valuable in allocating resources efficiently, or in aiding creditors in understanding past performance of the utility and in assessing future cash flows.
The court concludes that the rate base calculated in the Zinder report and used by Madison to justify the increase in utility rates approved in Ordinance 31-80 does not reflect a reasonable determination of cost. The rate of return derived from these rate base figures does not, therefore, accurately reflect the true net income of the utility. These conclusions having been reached, the court must further conclude that Ordinance 31-80 is invalid insofar as it purports to enact a rate increase based upon these unreasonable propositions.

III
The fixing of rates for supplying electricity by a municipal electric utility are to be established by ordinance. N.J.S.A. 40:62-13. This Madison has done in Ordinance 31-80. Unlike the charges of a normal public utility, such rates remain, until paid, municipal liens against the property where electricity is furnished and are collectible in the same manner as arrearages of taxes. N.J.S.A. 40:62-14.
Moneys derived by Madison from the operation of its municipal electric utility are to be "segregated" in a "separate ... utility fund" and must be treated by the borough council as "moneys held in trust for the purposes for which such separate fund was created," i.e., the supplying of electric service within the borough. N.J.S.A. 40A:4-62, 63.
*367 The moneys derived by Madison from its municipally-operated electric utility are "dedicated revenues", N.J.S.A. 40A:4-33, i.e., they are analogous to revenues derived from the collection of municipal assessments on property specially benefitted by a local improvement, N.J.S.A. 40A:4-37. Such moneys are not general revenues but rather are "required by law to be applied to a specific purpose," N.J.S.A. 40A:4-36  in this instance, the provision of electric service to consumers in the borough. See Newark v. Local Government Bd., 133 N.J.L. 513 (Sup.Ct. 1945) (Heher, J.):
(It is noteworthy that there is a specific dedication of the income of municipally owned utility services and special assessments levied on property benefitted by local improvements. R.S. 40:2-24, 40:2-33, 40:2-34 [now N.J.S.A. 40A:4-35, 40A:4-62, 40A:4-61]... The earmarking of municipal income for a special use is a deviation from the normal policy of making appropriations for public purposes ... and the dedicatory intention is not to be presumed but plainly indicated in the legislative expression. [at 516])
Except as provided in N.J.S.A. 40A:4-35, "all moneys derived from the operation" of the Madison electric utility "shall be applied only to the payment of the operating and upkeep costs, and interest and debt redemption charged on the indebtedness incurred" in constructing the utility plant (emphasis added). N.J.S.A. 40A:4-62.
N.J.S.A. 40A:4-35 permits the transfer of surplus from a municipal electric utility to the general fund of the municipality. Madison contends that this provision affords it broad discretion to set electric rates so as to produce substantial surpluses which can then be transferred to the municipal budget.
If so construed, N.J.S.A. 40A:4-35 would effectively emasculate the provisions of the Local Budget Law relating to dedicated revenues and separate utility trust funds. This is not what the Legislature intended. The only surpluses which may be transferred pursuant to N.J.S.A. 40A:4-35 are those arising "as a result of the operation of such utility ... under the system of accounting thus directed...." The "system of accounting thus directed" is a cash basis budget, N.J.S.A. 40A:4-3, which means "sufficient cash ... to meet all debt service requirements, *368 necessary operations ... [and] mandatory payments required to be met during the fiscal year." N.J.S.A. 40:4-2. It does not include a return on "investment" so great as to subsidize the general budget on a regular and planned basis. The substantial surpluses involved in this case have not occurred "as a result of the operation" of the Madison electric utility, but rather have been intentionally created. Such surpluses are not contemplated by the transfer provisions of N.J.S.A. 40A:4-35.
"The Local Budget Law is intended to control municipal expenditures by line item in order to insure that anticipated revenues equal anticipated expenditures." Kotlikoff v. Pennsauken Tp., 131 N.J. Super. 590, 594 (Law Div. 1974). "The line item designates the purpose of the expenditure," and it is improper to intentionally over-appropriate in one account so that the excess can be transferred to another. State v. Boncelet, 107 N.J. Super. 444, 449-451 (App.Div. 1969). This is in effect what Madison has historically done; it has appropriated more for electric utility revenues than it needed so that it could transfer this amount to the general fund.
The court recognizes the right of a municipal utility to earn a reasonable profit. 12 McQuillin, Municipal Corporations, § 35.37C, states: "In sum, the municipality may charge a rate which will yield a fair profit, and need not furnish the supply or service at cost." (See, also, San Antonio Independent School Dist. v. City of San Antonio, 550 S.W.2d 262 (Tex.Sup.Ct. 1977).
That such profits are necessary as a margin of safety for the utility in order to limit economic dislocation caused by vandalism, to prevent cash flow strains caused by late payments by users, or to account for the unpredictability of JCP&L fuel adjustment charges, was made clear during the trial. Such factors are relevant and clearly support the need for the utility to raise revenues over and above its own cost for providing electric service.
It is equally clear, however, that Madison has not primarily used its profits for these purposes, but has instead made it a *369 routine practice to transfer its electric utility surplus over to the general fund. This was consistently done despite the alleged need for the utility to retain some surplus. It is this practice which the court finds particularly unreasonable.
Furthermore, N.J.S.A. 40A:4-62 and 4-63, in establishing trust funds, provide the utility with an avenue through which the profits generated by the utility could be kept to meet legitimate contingencies.
In this case the court has looked to the cost to the utility in providing electric service as the measure of reasonableness. Thus, the needs of the utility govern the measure of the reasonableness of any surplus generated through rates charged to its customers. Madison may not set rates so far in excess of the needs of the utility that it creates a device whereby it can regularly rely upon the transfer of funds over to its general budget.

Payments in Lieu of Gross Receipts Taxes
Since 1976, the Madison Electric Utility budget has included a line item for "Payment in Lieu of Gross Receipts Taxes." Madison claims that this is the amount of money that the electric ratepayers in Madison would have had to pay in state gross receipts and franchise taxes if JCP&L or any other public utility provided electric service to the borough. According to the borough, all of this money would then be returned to it by the State. Therefore, Madison maintains, it is proper to include this amount as an expense of the electric utility and pay it over to the general fund of the borough.
A review of the Gross Receipts and Franchise Tax Act reveals that (1) not all of the tax revenue collected by the State is returned to local governments and (2) there is no correlation whatsoever between the amount of tax paid by ratepayers in a municipality and the amount that that municipality receives from the State. See N.J.S.A. 54:30A-49 et seq. See, *370 also, McKenney v. Byrne, 82 N.J. 304 (1980). Thus, even if Madison's rationale for these "in lieu" payments were to be accepted, the computation it has used to determine the amount is clearly erroneous.
A more fundamental question, however, is whether the "in lieu" payment is one of the "operating and upkeep costs" of the utility within the meaning of N.J.S.A. 40A:4-62. The Local Budget Law requires that a municipal budget be prepared on a "cash basis". N.J.S.A. 40A:4-3. A "cash basis budget" is defined as a budget in which there will be sufficient cash collected for "necessary operations" and "mandatory payments required to be met during the fiscal year." N.J.S.A. 40A:4-2. The "in lieu" payment is clearly not mandatory or necessary, nor does it have anything to do with the operation or upkeep of the utility. It is a matter of "policy," not cost. If the "in lieu" payment is not made, the Madison electric utility will continue to operate precisely as it has. Moreover, in 1976 Madison did not report its "in lieu" charge as an operating expense, but rather as a portion of "Excess in Revenue." Accordingly, the "in lieu" payments are not an expense of the Madison electric utility within the meaning of the Local Budget Law and may not be designated as such in its budget.

Conclusion
In accordance with the above, the court finds Ordinance 31-80 (and Ordinance 39-81) to be invalid. The court also finds that plaintiff has failed to meet its burden of proving that the rate structure, as applied, discriminated against plaintiff or the GS secondary class of customers. In the sense that the rates are unreasonable, they can be said to be equally unreasonable as to all purchasers of electric power within the Borough of Madison, and plaintiff is entitled to no special award of damages as a result thereof.
The Borough of Madison shall immediately undertake the establishment of a utility rate structure anticipating a reasonable *371 surplus to provide for contingencies, but shall not include any provision for "in lieu of franchise tax payments" and shall not include any provision for any other specific contribution from the utility to the general revenues of the Borough.
Moneys held as reserved for this litigation need no longer be reserved and may be appropriated in the discretion of the Borough of Madison as part of its enactment of a new electric utility tariff schedule, or retained in a utility trust fund as contemplated by N.J.S.A. 40A:4-63.
NOTES
[1] Ordinance 39-81, adopted by the Madison Borough Council on November 2, 1981, simply amended Ordinance 31-80 by setting forth the factors and criteria upon which the rate structure of Ordinance 31-80 was based.
[2] As noted supra, the Madison utility provides service only within the limits of the borough.
[3] It is relevant to note at this juncture that in addition to attempting to reconcile the disparity between the figures presented in the BPU reports with the figures contained in the annual audit reports, there exists the further problem of the taking of depreciation as an expense of the utility in the BPU reports. As noted above, municipalities are required to employ a cash basis budget. Depreciation is not a proper cash basis expense.

The Madison budget (as reflected in the audit reports) treats amortization of principal and interest on the bonds issued to fund the construction of utility improvements as an expense. This is in accordance with a cash basis budget (see N.J.S.A. 40A:4-2) and is specifically recognized in N.J.S.A. 40A:4-62 as a proper charge against revenues.
It is improper to take as an expense both depreciation and amortization of debt. Since amortization of debt is required under municipal accounting principles as a proper expense item, the inclusion of depreciation as an expense of the utility should be eliminated.