188 N.J. Super. 212 (1983)
457 A.2d 43
H.P. HIGGS COMPANY, INC., PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
THE BOROUGH OF MADISON, A MUNICIPAL CORPORATION, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 20, 1982.
Decided February 8, 1983.
*214 Before Judges MILMED, MORTON I. GREENBERG and FURMAN.
Herbert A. Vogel argued the cause for appellant (Vogel & Chait, attorneys; Richard C. Erdman on the brief).
William C. Slattery argued the cause for respondent (Rosen, Gelman & Weiss, attorneys; James H. Laskey on the brief).
The opinion of the court was delivered by MORTON I. GREENBERG, J.A.D.
This matter comes before this court on appeal and cross-appeal of judgments entered in the Superior Court, Law Division, following a nonjury trial. The decision of Judge Bangiola, the trial judge, on the principal issues in the case is reported at 184 N.J. Super. 355 (Law Div. 1982).
*215 Plaintiff, a New Jersey corporation with offices in the Borough of Madison, filed the complaint on December 19, 1980. It sought to bring the case on its own behalf and on behalf of a class constituting all purchasers of electricity from defendant. Plaintiff alleged that defendant, Borough of Madison, a municipal corporation, owns and operates an electric utility which is the sole supplier of electricity for public use within defendant's boundaries. Plaintiff alleged that defendant does not own or operate generating facilities but rather purchases electricity in bulk at wholesale rates from Jersey Central Power & Light Company (hereinafter "JCP & L"). Defendant resells the electricity at retail rates and distributes it through its distribution system.
Plaintiff asserted that it requires electricity for its business operations which it purchases from defendant. Defendant charges plaintiff rates based on defendant's general service secondary rate schedule. Plaintiff asserted that defendant on December 8, 1980 had enacted Ordinance 31-80, to be effective January 1, 1981, for the purpose of increasing rates as of January 1, 1981. Plaintiff alleged that the new rates were arbitrary and unreasonable because they were predicated on rates charged by JCP & L rather than on defendant's costs. Plaintiff pointed out that the costs of JCP & L were materially different from those of defendant. Plaintiff further asserted that defendant's rates were based in substantial part on gross receipt taxes or payments in lieu of such taxes not actually paid. Plaintiff alleged that the proposed rates would produce an excessive and unreasonable return. Plaintiff asserted that the rates discriminated against customers charged on the general service secondary rate schedule. Plaintiff further alleged that the ordinance was in essence a form of illegal taxation adopted to keep down real estate taxes. Plaintiff requested judgment enjoining enforcement of Ordinance 31-80, declaring it to be void and ordering a refund of all moneys to be collected by defendant under the ordinance. Plaintiff asked that defendant be compelled to set rates based on defendant's costs. Plaintiff *216 brought this action in the Superior Court since defendant, in the operation of the utility within its own boundaries, is not subject to regulation by the Board of Public Utility Commissioners (hereinafter "BPU").
Defendant filed an answer to the complaint, essentially admitting the facts asserted by plaintiff. But defendant denied that its rates were arbitrary or unreasonable. It further set forth that it had the power to adopt the rates and that it was authorized by N.J.S.A. 40A:4-35 to transfer the utility surplus to its general operating fund.
After it filed the complaint plaintiff sought an interlocutory order restraining enforcement of Ordinance 31-80. This application was denied but the trial court did by order dated February 4, 1981 direct that money collected as a result of the rate increases in the new ordinance be shown on defendant's balance sheet as an item of reserve. Plaintiff also moved twice for class certification but these applications were denied. The first order denying class certification was dated February 4, 1981.
Subsequent to the institution of the action, defendant engaged the firm of H. Zinder & Associates (hereinafter "Zinder") to conduct a valuation of a rate base for its electric utility and to determine the cost of service allocation. By the use of a reproduction cost new (hereinafter "RCN") method of valuation, Zinder reported that the utility's current worth of plant in service before depreciation was $12,345,600. Zinder applied straight-line depreciation and determined that the current depreciated value of defendant's net plant in service was $9,340,600. It considered the $3,005,000 difference to be a depreciation reserve. Zinder added costs of working cash, materials and supplies to the depreciated value and arrived at a base of $9,888,700. By the use of this rate base Zinder calculated that defendant's rate of return was 3.29%. Zinder considered that this return was not unreasonably high.
After receipt of the Zinder report defendant adopted Ordinance 39-81 amending Ordinance 31-80. Ordinance 39-81 accepted *217 the rate base and depreciation schedule as determined by Zinder and provided for the continued transfer of payments in lieu of franchise and gross receipts taxes. Ordinance 39-81 did not change the rates established in Ordinance 31-80.
The trial began on November 2, 1981. Plaintiff produced an expert witness, Jamshed K. Madan, a principal in a management consulting firm specializing in utility regulation. Madan testified that of the several different methods of determining a rate base for the utility, the most appropriate was the original cost method. He indicated that method "goes back and accumulates cost based on what was actually expended for a certain asset at a certain point in time. Generally speaking for simplicity, these are the figures one would find when one reads a balance sheet of an entity." Taking an original cost basis as set out in the annual report that Madison had filed with the BPU as required by N.J.S.A. 40:62-2 for the year ending December 31, 1979, the latest figures available to him, Madan stated that the net utility plant investment was $1,407,139. He ascertained this figure by deducting accumulated amortization and depreciation of $2,860,921 from the gross plant of $4,268,060. This gave the net utility plant investment. He added to that figure cash working capital which he calculated at $226,805. Thus he arrived at a rate base of $1,633,944. Madan then indicated that a fair rate of return was 8.36%. He determined from the rate base and fair rate of return that the utility should earn approximately $136,000. Figures supplied by defendant in the December 31, 1979 report to the BPU showed its income from the utility to be $738,816. Madan concluded defendant had excess income of over $602,218.[1]
An expert witness called by defendant, Jack O. Sanders, a vice-president of Zinder, contradicted Madan's testimony. Sanders stated that information contained in the annual report did not conform to the uniform system of accounts of the Federal Energy Regulatory Commission and adopted by the BPU. Thus *218 use of the information would give a distorted picture which could not be relied upon to determine the adequacy or inadequacy of a rate. Sanders testified further that information concerning the original cost of the facilities was not readily available and the numbers included in the annual report purportedly representing that cost were inaccurate. He further cast doubt on Madan's testimony by indicating that only amortization of bonded debt, and not depreciation of property, had been included in the total electric operating expenses line item of the report. This, in Sanders' opinion, resulted in inaccuracies in Madan's computations.
Defendant produced witnesses explaining in detail the method by which Zinder had developed the rate base. Bertil P. Dahlstrom, a consultant to Zinder, testified that Zinder made an inspection of plans showing the utility's facilities. Records were checked. In addition, a field inspection was undertaken. Further, Zinder consulted with representatives of JCP & L, Public Service Electric & Gas Company, defendant, defendant's electrical consultants and other persons with useful information. From these sources a detailed inventory of the utility components was completed and the current value of these items was determined by "trending" in accordance with a widely used engineering publication, The Handy Whitman Index of Public Utility Construction Costs. By use of this approach a current valuation of the utility plant was ascertained. After depreciation was calculated, the plant valuation was fixed at $9,340,600. Sanders stated that this method was more accurate than that followed by Madan because the RCN value as depreciated represents a current value of the facilities. Sanders testified that an investor would expect some recognition of fair value in determining a return. He said that value arrived at was above the original cost but below the reproduction cost.
Two members of defendant's governing body, the council, John L. Reid and Carl Fruehling, testified. Councilman Reid stated that as both a member of the council, its finance chairman, and as a professional engineer he believed the rates set by *219 defendant were fair and reasonable. He stated that the utility makes payments which the council considered reasonable in lieu of gross receipts taxes to defendant. Reid further testified that Ordinance 31-80 was proposed several months after JCP & L raised its retail rates. It was enacted to prevent a potentially disastrous situation should an anticipated 30% increase in JCP & L's wholesale rate for 1981 take effect. Reid considered it better to impose small incremental increases on ratepayers rather than large increases, following a substantial increase by JCP & L in wholesale rates. Reid indicated that between 1978 and 1980 there had been an 89.1% increase in the wholesale cost of power. This increase was accompanied by a decrease in the percentage of revenues over expenses earned by the utility.
Councilman Fruehling, a professional engineer and director of transmission and distribution engineering for JCP & L, testified that using JCP & L rates was a reasonable practice. He reached this conclusion since the same standards applied to Madison and JCP & L. He thought that the work and expense of a separate rate study would do no more than "reinvent the wheel."[2] Fruehling had concluded, based on his knowledge of the utility even prior to adoption of Ordinance 31-80, that the value of the utility plant was over $12 million. He agreed with Reid's sentiments regarding the advantage of small increases in rates.
As we have already indicated, Judge Bangiola decided the case in a written opinion. He pointed out that defendant's costs were not necessarily similar to those incurred by JCP & L in supplying power to its customers. 184 N.J. Super. at 362. Judge Bangiola stated that defendant's desire to maintain a parity with rates in other communities was not a sufficient basis to rebut what he found to be "inherently an unreasonable method of establishing a utility rate." He viewed the rates to be *220 unreasonable as they are based "not on cost but on convenience." Ibid. Although he found defendant's method of establishing rates to be unreasonable, he determined that neither plaintiff nor the general service secondary class of customers had been subject to discrimination. Rather the judge concluded that the rates were unreasonable as charged all purchasers of electricity from defendant.[3] 184 N.J. Super. at 362-363. The judge further determined that the rate base and the rate of return as calculated by Zinder and adopted by the borough were also unreasonable. 184 N.J. Super. 366.
In reaching his conclusion Judge Bangiola premised his holding on the statutory requirement that municipally owned utilities are required to keep the books of the utility in accordance with the cash basis municipal accounting method. See N.J.S.A. 40:62-2; N.J.S.A. 40A:4-1 et seq. (Local Budget Law). The judge noted the discrepancies in the valuation of the net utility plant as established on one hand in the Zinder report and in the 1979 and the 1980 BPU reports revised to reflect Zinder's findings, $11,275,200 for 1979 and $12,257,600 for 1980, and on the other hand in the valuation set forth in defendant's audit reports, $4,268,060 for 1979, before amortization, and $4,288,022 for 1980. He pointed out that because rate base and rate of return are largely dependent on the net utility plant figure, plaintiff's and defendant's experts offered quite contradictory testimony: plaintiff, rate base of $1,633,944, rate of return, 45.22%; defendant, rate base of $9,888,700, rate of return, 3.29%. 184 N.J. Super. at 364-365. Judge Bangiola concluded that under N.J.S.A. 40A:4-34, dealing with appropriations for municipally-operated utilities, reproduction cost figures, the RCN method used by Zinder, do "not by themselves constitute a reasonable foundation upon which to calculate a rate base." 184 *221 N.J. Super. at 366. Therefore the rates established by the municipality did not reflect a reasonable determination of cost. Ibid.
The judge considered the propriety of a transfer of surplus from the utility to defendant's general fund. He recognized that N.J.S.A. 40A:4-35 permits such transfers. 184 N.J. Super. at 367. He concluded, however, that the deliberate generation of surplus revenues in order to subsidize defendant's general fund was an unreasonable practice. 184 N.J. Super. at 367-368. He stated that statutory provisions require that revenues derived from operation of a utility be applied to the specific costs incurred by the utility. He further noted the cash basis method of accounting directs that sufficient cash be raised to meet expenses. While allowing a reasonable profit as a margin of safety to meet contingencies was a proper exercise of municipal authority, defendant's practice of setting rates in excess of the utility's needs was invalid. 184 N.J. Super. at 366-369.
Finally the judge addressed Madison's practice of transferring payments in lieu of gross receipts and franchise tax to the general fund. The judge found the payment was neither mandatory nor necessary. Because the utility did not have to pay the tax, listing the tax as an operational expense was merely a device to transfer those funds to defendant. Judge Bangiola concluded that in lieu payments have nothing to do with the operation or upkeep of the utility and therefore should not be included as an expense in its budget. 184 N.J. Super. at 369-370.
As a result of his determinations, Judge Bangiola invalidated Ordinances 31-80 and 39-81. He then ordered:
... the establishment of a utility rate structure anticipating a reasonable surplus to provide for contingencies, but shall not include any provisions for `in lieu of franchise tax payments' and shall not include any provision for any other specific contribution from the utility to the general revenues of the Borough. [at 370-371]
The judge, however, declined to order a refund of money he found to have been improperly collected. On January 27, 1982 Judge Bangiola signed a final judgment invalidating Ordinances *222 31-80 and 39-81, directing defendant to establish new utility rates in accordance with his opinion and providing that the rates should not include "any provision for in lieu of franchise tax payments." Plaintiff subsequently moved for counsel fees. This motion was denied by order dated April 8, 1982. Defendant has appealed from the judgment invalidating its rate structure. Plaintiff has cross-appealed from the judgment insofar as it failed to order a refund to ratepayers of the reserve established by the order of February 4, 1981, failed to order the repayment to the utility fund of $546,579 "in lieu of gross receipts and franchise tax payments transferred from the utility fund to the general fund" during the pendency of the action and failed to award plaintiff counsel fees.
There are certain threshold considerations which we consider in determination of this appeal. A municipality is authorized to operate an electric utility and to fix and collect rates and charges for supply of electricity. N.J.S.A. 40:62-12; N.J.S.A. 40:62-13. A municipality which operates a utility beyond its corporate limits is subject to supervision and regulation of the BPU. N.J.S.A. 40:62-24. The Legislature, however, has made no such provision with respect to a utility operated wholly within and by a single municipality such as the electric utility operated by defendant. Such a municipality may establish rates for its utility without BPU approval. There is a general presumption of reasonableness which attends all municipal enactments. Dock Watch Hollow Quarry Pit v. Warren Tp., 142 N.J. Super. 103, 116 (App.Div. 1976), aff'd 74 N.J. 312 (1977). Therefore an ordinance establishing rates for use of utility facilities will be upset only if patently unreasonable. See Piscataway Apt. Ass'n v. Piscataway Tp., 66 N.J. 106, 109 (1974); Crowe v. Sparta, 106 N.J. Super. 204, 206 (App.Div.), certif. den. 55 N.J. 79 (1969).
We further note that the action of a municipality in setting rates is subject to the political power of the electorate to change the governing body if the electorate is dissatisfied with the rates *223 set. As the Supreme Court stated in In re Morris Tp.'s Complaint, 49 N.J. 194 (1967):
We are not dealing with the power of the board to regulate the rates of a water utility municipally owned and controlled, whose service is confined within the borders of the municipality. In such cases the Legislature may not regard the need for local consumer protection as compelling. If the resident consumer-voter does not like the management or the rates, he can vote the governing body out of office, and thus achieve reform. See, City of Lamar v. Town of Wiley, 80 Colo. 18, 248 P. 1009 (Sup.Ct. 1926). That voter control is lacking when the municipal utility extends its service to residents of adjoining communities. [at 204-205]
Here the potential of the political process to correct abuses in defendant's rate structure is evident. Defendant is the sole supplier of electricity within its boundaries. Thus we may reasonably presume that charges for electrical service are paid by or on behalf of every resident and every voter in Madison. Yet the electorate has not caused the governing body to change the rate structure to eliminate surpluses. It is, of course, clear that the practice followed by defendant has permitted the real estate tax rate to be lower than it could be without the transfers. Thus persons who have paid the electric rates have benefited from reduced property taxes.[4] The fact that the electrical service is supplied throughout the borough guarantees that this is not a case in which electricity users in a particular portion of the municipality are subject to discrimination in favor of other property owners in other sections. Therefore, in reaching our decision we must recognize that the rates are charged throughout the municipality, do not discriminate against plaintiff, have been adopted as a result of actions of persons locally elected, are presumptively valid and seemingly reflect the majority view of local sentiment as to what is appropriate.
*224 In passing upon the validity of the rates we must notwithstanding their local acceptance consider whether defendant had a reasonable basis for adopting them. As previously noted, defendant has used rates followed by JCP & L. Those rates are, in turn, subject to approval by the BPU and may therefore be regarded as nondiscriminatory among users. Further, they are in effect in the municipalities surrounding Madison. Following these rates has relieved defendant of the burden of independently establishing a rate structure. Further, there is a major connection between defendant and JCP & L since defendant acquires its electricity from JCP & L. While it is true that use of the rates has generated a surplus, by transferring the surplus to itself defendant has been able to establish lower tax rates and thus benefit all property owners throughout the municipality. It is therefore clear that the presumption of validity of the rates is buttressed by a strong showing that they are reasonable in fact.
Since defendant's rates are presumptively valid and have a reasonable foundation supporting them, we next determine whether they nevertheless violate some particular principle and are thus invalid. Judge Bangiola thought so. Citing Crowe v. Sparta, supra, 106 N.J. Super. at 204, he stated that: "it is settled that rates may not be justified as reasonable based on a comparison with rates in surrounding areas." 184 N.J. Super. at 362. Hence he concluded that the basic legal foundation of the rates was undermined. We do not read Crowe as standing for that proposition. In Crowe the objectors to the municipal sewerage charges contended that the rates were unduly high when compared with sewer rates charged by other municipalities. This court said that in view of the general fiscal situation and peculiar requirements and costs with respect to the sewerage system of a particular municipality, comparison with rates of those in another municipality is at best of dubious value. 106 N.J. Super. at 206. Therefore, what we were saying is that municipal rates are not suspect merely because they diverge from those followed elsewhere. But we were by no means *225 suggesting that it could not be reasonable to adopt rates followed in surrounding areas. Thus, Crowe is not authority to invalidate defendant's rates simply because they were adopted from those in surrounding areas.
Judge Bangiola perceived that the "reasonableness of rates is more properly judged as a function of cost." 184 N.J. Super. at 362. Therefore he considered the rates unreasonable since the costs reflect the wholesale rate. The judge noted that "any differential between the wholesale rate and the retail rate simply accrues to the municipal utility irrespective of cost." Ibid. If this implies that the differential represents a full benefit to the utility, it is misleading. It assumes that defendant has no expenses other than the cost of power. In fact, the record shows that 88% of defendant's operating and maintenance costs are represented by the cost of purchasing power from JCP & L. Thus defendant has expenses in addition to its cost of power for operation and maintenance. It also has administrative and general expenses. Further, we think it reasonable to believe that both the wholesale and retail rates established by JCP & L reflect its costs. The record in this case indicates that there have been increases in JCP & L's wholesale rate and retail rates. Consequently, to some degree by adopting JCP & L's retail rates defendant has reflected increased costs to it.
Nevertheless, it cannot be denied that defendant, by charging the retail rates as established by JCP & L, has consistently created surpluses which have been transferred to its general fund from the electric utility. The trial judge in his opinion has indicated the amount of the transfers. 184 N.J. Super. at 359. Defendant does not challenge the judge's factual findings on the amount of transfers. Thus, defendant's rates are not simply a matter of costs. The judge perceived that defendant could not operate the utility so as to create intentionally surpluses for the purpose of transfer of funds to its general fund. He reached this conclusion by considering the interplay *226 between N.J.S.A. 40:62-2 and the Local Budget Law, N.J.S.A. 40A:4-1 et seq. He noted that under N.J.S.A. 40:62-2 defendant was required to keep its books, records and accounts in the same manner as provided by statute for keeping other books, records and accounts of a municipality. 184 N.J. Super. at 363. The Local Budget Law requires that the budget of a local unit (thus including a municipality) shall be kept on a cash basis unless otherwise permitted by law. The Legislature has provided that a
"cash basis budget" means a budget prepared in accordance with this chapter, and in such form that based on the limitations, percentages and estimates hereinafter provided there will be sufficient cash collected to meet all debt service requirements, necessary operations of the local unit for the fiscal year and, in addition, provide for any mandatory payments required to be met during the fiscal year. [N.J.S.A. 40A:4-2]
The judge seems to have been of the view that since a cash basis budget must generate sufficient cash to meet all expenses it cannot be intended to generate cash over and above that amount. 184 N.J. Super. at 363-364. We do not agree with this conclusion. A basic purpose of the Local Budget Law is that a municipality make its ends meet within a fiscal year. See State v. Boncelet, 107 N.J. Super. 444, 450 (App.Div. 1969). Thus, a cash basis budget must generate enough cash to meet the expenditures anticipated. Therefore, a budget that generates surpluses is not inconsistent with the purposes of the Local Budget Law. Indeed the Legislature contemplated that surpluses could be intentionally created. N.J.S.A. 40A:4-32(f) provides that a governing body may provide for such reserves as it deems advisable. N.J.S.A. 40A:4-23 states that anticipated revenues may include "surplus anticipated." Further, N.J.S.A. 40A:4-35 provides that in any year in which, as a result of the operation of a utility under an accounting system adopted by the governing board (see N.J.S.A. 40A:4-34), "there shall be a surplus, or such surplus can be reasonably anticipated, then such surplus, when authorized by the board or body controlling the utility or enterprise, may be included in the budget as an item of miscellaneous revenue, under the caption of `Surplus from ... *227 (designation of the utility fund).'" Thus a "cash basis budget" must provide for cash to satisfy the needs of the local governing unit. It does not preclude generation of a surplus over that amount.
In Reahl v. Randolph Tp. Municipal Utilities Auth., 163 N.J. Super. 501 (App.Div. 1978), certif. den. 81 N.J. 45 (1979), we did not require that a utility authority bill users of a sewerage system on the basis of costs to the authority notwithstanding the fact that there were four separate groups of users within the area of the authority's jurisdiction. Of course, the authority had different costs for each group. Yet we held that it did not have to calculate the cost of service for each group. Instead, we approved a uniform charge. While Reahl was decided on the basis of statutes not directly implicated here, the decision is helpful. It establishes that the charge to an individual user need not be based simply on the costs of servicing him. Similarly, we hold that the charges to defendant's customers need not be based solely on defendant's costs.
Judge Bangiola noted that N.J.S.A. 40A:4-62 requires that moneys derived from the operation of a publicly-owned utility shall be segregated and kept in a utility fund and be applied only to the payment of certain expenses of the utility. 184 N.J. Super. at 366. But this requirement of segregation of funds is expressly made subject to the provisions of N.J.S.A. 40A:4-35. Since N.J.S.A. 40A:4-35 provides that surplus and anticipated surpluses may be included in the budget of the municipality, clearly they may be transferred.
Judge Bangiola held that it was improper for the utility budget to include a line item for "Payment in Lieu of Gross Receipts taxes." 184 N.J. Super. at 369-370. These taxes are those mandated by N.J.S.A. 54:30A-49 et seq. Defendant, as a municipality, is not required to pay to JCP & L the amount that JCP & L would collect from a private user for payment of these taxes. Defendant has included the line item for payment in lieu of these taxes as a method to transfer moneys to defendant's *228 general fund. In view of the result that we reach, extended discussion of this item is unnecessary. Nevertheless, since we are holding that defendant could intentionally create surpluses in its electric utility budget to transfer moneys to its general budget, we see no reason why this device should be invalidated.
In summary, we have considered each basis for possibly concluding that the rates established by defendant, though presumptively valid and reasonable, in fact are nevertheless invalid. We find no reason in any of them to invalidate the rates. In reaching our conclusion we do not suggest that electric utility charges are a substitute for general taxation. Rather, we hold that in the circumstances of this case charges otherwise reasonable are not invalid simply because they result in the creation of surpluses to be transferred to defendant's general budget.
We recognize, of course, that much of the trial in this matter was devoted to proof of the rate base of the utility. We make no finding as to how such base should be calculated. Defendant determined its base after the complaint was filed simply to justify the rates it already had established. In our view it need not have done so. The purpose of a rate base is to establish a fair rate to the users so that a utility may receive a just return on the fair value of its property and so that the public is not burdened with unreasonable costs. See In re Proposed Intrastate Industrial Sand Rates, 66 N.J. 12, 21-23 (1974). It is clear to us that in this case a rate base is irrelevant. Defendant does not have to establish its base in order to provide a fair rate of return for the ultimate benefit of shareholders, for it has none. Further, we have determined that its rates are reasonable regardless of its rate base. If the people of Madison are dissatisfied with the rates, their remedy is through the political process. See In re Morris Tp.'s Complaint, supra, 49 N.J. at 204-205.
Plaintiff has cross-appealed from the order denying a refund of money that the trial judge found improperly collected and *229 from orders denying class action certification and counsel fees. In view of our decision there are no moneys to refund. Further, in the light of our disposition of the substantive issues in the case, we would hardly remand the matter for treatment of the case as a class action. Finally, we see no basis on which to award plaintiff counsel fees. There is no fund in court. R. 4:42-9(a)(2).
The interlocutory order of February 4, 1981 denying class action certification is affirmed. The judgment of January 27, 1982, insofar as it declared Ordinances 31-80 and 39-81 invalid and compelled defendant immediately to establish new utility rates without provision "for in lieu of franchise tax payments," is reversed. Insofar as the judgment did not order a refund of any moneys or award counsel fees it is affirmed.[5] The order of February 4, 1981 requiring defendant to establish a reserve on its books for increases in rates provided in Ordinance 31-80 is vacated. The complaint is dismissed.[6]
NOTES
[1] There seem to be insignificant inconsistencies in these calculations.
[2] Defendant charges two large users of electricity a rate over that established by JCP & L. Neither is a party to this litigation.
[3] Plaintiff on this appeal does not assert that it is the victim of discrimination. Thus we are not concerned with a question of equitable allocation of costs among users. See White Birch Realty Corp. v. Gloucester Tp. Municipal Utilities Auth., 80 N.J. 165 (1979).
[4] Of course, an electricity user owning tax exempt property would be aided by a reduction in electrical rates and the shifting of the municipal finance burden to the real estate tax. Plaintiff does not suggest that it is such a property owner. Nonresidents owning vacant land receive a windfall from the amelioration of property taxes by reason of transfer of funds from the utility.
[5] Defendant filed its cross-appeal on February 24, 1982. The order denying counsel fees was entered April 8, 1982. Thus, the appeal of the action of the court denying counsel fees may have been premature. In any event, we treat the cross-appeal on counsel fees as having been from the order of April 8, 1982.
[6] The Legislature passed S. 1317 (1982). This bill was conditionally vetoed by the Governor on January 31, 1983 and returned to the Senate. The bill, if it becomes law in the form passed by the Legislature, will amend N.J.S.A. 40:62-13 to specify factors that the municipality must consider in establishing a rate structure. The bill will also permit the utility to increase annually its surplus in an amount not exceeding 15% of the annual costs of the operation of the utility and will permit surpluses from the utility to be transferred for inclusion in the local budget pursuant to N.J.S.A. 40A:4-35. The Governor's objections relate to the ill-advisability, in his view, of specifying a particular limit to the amount of surplus that may be generated by a municipal utility. In addition, the Governor has objected to a limitation of the amount that a utility operating solely within a single municipality may transfer to its general budget. Ordinarily, on direct review we apply the legislation in effect at the time of our decision. See Orleans Builders & Developers v. Byrne, 186 N.J. Super. 432, 445 (App.Div.), certif. den. 91 N.J. 528 (1982). Nevertheless, even if the bill becomes law, we would still be required to decide the issues in this case since plaintiff seeks a refund of rates already collected. There is no provision in the bill as passed by the Legislature or in the Governor's objections that the bill be applied retroactively. Certainly, in the absence of such direction we could hardly apply a statute which deals with local budgets and utility rates retroactively. See Gibbons v. Gibbons, 86 N.J. 515 (1981). It should, of course, be understood that if the bill becomes law, either as originally passed or in an amended form, defendant must comply with its specific requirements notwithstanding this opinion. In such case, if defendant continues to include in its utility budget an item for payment in lieu of gross receipts taxes, plaintiff is free to challenge such inclusion.