126

MAYOR AND MUNICIPAL COUNCIL OF THE CITY OF CLIFTON, A MUNICIPAL CORPORATION AND SUBDIVISION OF THE STATE OF NEW JERSEY; AND JOSEPH J. LYNN, SR., PLAINTIFFS–RESPONDENTS AND CROSS–APPELLANTS, AND BOROUGH OF FAIR LAWN; TOWN OF NUTLEY; BOROUGH OF LINCOLN PARK; AND BOROUGH OF HALEDON, PLAINTIFFS, v. PASSAIC VALLEY WATER COMMISSION, A BODY POLITIC AND SUBDIVISION OF THE STATE OF NEW JERSEY; AND CITY OF PATERSON, DEFENDANTS–APPELLANTS AND CROSS–RESPONDENTS, AND BOROUGH OF BLOOMINGDALE; BOROUGH OF ELMWOOD PARK; TOWNSHIP OF FAIRFIELD; CITY OF GARFIELD; TOWN OF HARRISON; BOROUGH OF NORTH ARLINGTON; TOWNSHIP OF NORTH CALDWELL; CITY OF PASSAIC; BOROUGH OF RINGWOOD; BOROUGH OF TOTOWA; TOWNSHIP OF VERONA; BOROUGH OF WALLINGTON; AND BOROUGH OF WEST PATERSON, DEFENDANTS.

SENATOR JOSEPH BUBBA, MAYOR SAMUEL CHERBA AND ASSEMBLYMAN GERALD ZECKER, PLAINTIFFS–RESPONDENTS, v. PASSAIC VALLEY WATER COMMISSION, A BODY POLITIC AND SUBDIVISION OF THE STATE OF NEW JERSEY, DEFENDANT–APPELLANT, AND IMRE KARASZEGI, JR., DEFENDANT.

MAYOR AND MUNICIPAL COUNCIL OF THE BOROUGH OF NORTH ARLINGTON, A MUNICIPAL CORPORATION AND SUBDIVISION OF THE STATE OF NEW JERSEY; AND ROBERT LANDOLFI, PLAINTIFFS–RESPONDENTS, v. PASSAIC VALLEY WATER COMMISSION, A BODY POLITIC AND SUBDIVISION OF THE STATE OF NEW JERSEY, DEFENDANT–APPELLANT.

Argued January 3, 1989—Decided May 3, 1989.

*Harold Goldman* argued the cause for appellant and cross-respondent Passaic Valley Water Commission, etc. (*William Rosenberg,* General Counsel, attorney).

*Susan E. Champion,* First Assistant Corporation Counsel, argued the cause for appellant and cross-respondent City of Paterson (*Ralph L. DeLuccia, Jr.,* Corporation Counsel, attorney).

*Sam Monchak,* City Counsel, argued the cause for respondents and cross-appellants Mayor and Municipal Council of the City of Clifton, etc., et al.

*Peter A. Scandariato* argued the cause for respondents Mayor and Municipal Council of the Borough of North Arlington, et al. (*Edwin C. Eastwood, Jr.,* attorney).

*Patrick J. Caserta* argued the cause for respondents Senator Joseph Bubba, et al. (*Kessler and Caserta,* attorneys).

*John J. McKniff,* City Attorney, submitted a letter in lieu of brief on behalf of City of Passaic.

The opinion of the Court was delivered by

GARIBALDI, J.

Pursuant to *N.J.S.A.* 40:62–108 to –150.2 (the enabling statute), the cities of Paterson, Passaic, and Clifton (the owner-cities) on February 3, 1931, entered into an agreement to form

the Passaic Valley Water Commission (PVWC), a municipally-owned-and-operated water company. On April 9, 1986, PVWC adopted a resolution authorizing it to distribute $500,000 of "surplus" funds to its three owner-cities in accordance with paragraph 13 of the February 3, 1931, Agreement (the 1931 Agreement). Whether PVWC's distribution of "surplus" funds to its owner-cities is authorized under the enabling statute is the primary appealable issue. We hold that PVWC's distribution is not authorized.

## I

Prior to 1921 the residents of the owner-cities received most of their water from Passaic Consolidated Water Company, a private water company. In 1930 the owner-cities formed PVWC to acquire the Passaic Consolidated Water Company pursuant to *N.J.S.A.* 40:62–109, which provides in relevant part:

for the appointment of a commission to acquire by purchase or condemnation such waterworks with all rights and franchises relating thereto, and the rights and franchises to obtain an additional supply of water, and any or all other property of the owner of such waterworks as may be necessary to maintain, operate, enlarge or extend the waterworks so acquired, and to enlarge, extend, maintain and operate the same to supply water in the municipalities acquiring such waterworks as aforesaid and all other municipalities theretofore supplied with water by said waterworks.

The 1931 Agreement sets forth the general operating rules of PVWC. In accordance with the terms of the 1931 Agreement, PVWC is governed by four commissioners selected by the three cities under terms set out in the Agreement. Two representatives from Paterson sit on the PVWC, in addition to one each from Passaic and Clifton. All four members constitute a quorum for meetings, while the affirmative vote of three is required to adopt any motion or resolution. Consistent with *N.J.S.A.* 40:62–129, Paragraph 19 of the Agreement also provides that it may be amended from time to time by the assent of the governing bodies of the cities containing at least two thirds of the population of all the cities as measured by the last national census.

Specifically, at issue in the instant case is paragraph 13 of the 1931 Agreement, which provides:

Reports shall be made to the respective cities quarterly on the first days of each March, June, September, and December in each year which shall contain a detailed statement of the operation of the waterworks and any other information of value to the cities. *The Commission shall transmit all moneys in their hands acquired from such operation beyond what is necessary to meet its obligations, to the TREASURER of the respective Cities in proportion to their ownership in said water works,* that is to say, in the proportion that the assessed valuation for taxation of all real estate of each of said cities for the year Nineteen Hundred and Twenty–Nine, bears to the total assessed valuation for said year of all the real estate in all said cities. (Emphasis added).

PVWC is the fiscal agent for its three owner-cities, Passaic, Paterson, and Clifton. *N.J.S.A.* 40:62–122. The owners of property located in each of the cities to which PVWC supplies water are billed directly, and their bills constitute a lien against their property. Additionally, pursuant to *N.J.S.A.* 40:62–127, PVWC sells water to twenty non-owner municipalities on a wholesale basis, who in turn own and maintain their water distribution systems and bill their customers directly. In 1985 34% of all water sold by PVWC went to non-owner cities, and in 1986 this figure rose to 36½%. The owner-cities have not had to expend any money to finance the acquisition, operation, maintenance, or enlargement of the waterworks. PVWC has paid these costs from revenues.

No distributions to the owner-cities were made during the first twenty years that PVWC existed; thereafter distributions were made from 1952 to 1986 as follows:

| | | |
|---|---|---|
| 1952 | – | $150,000 |
| 1953 | – | $125,000 |
| 1957 | – | $100,000 |
| 1962 | – | $350,000 |
| 1984 | – | $700,000 |
| 1985 | – | $375,000 |
| 1986 | – | $500,000 |

On April 9, 1986, PVWC, by a 3–1 vote, approved a Resolution authorizing the December 1986 distribution of $500,000 of "surplus" funds to the three owner-cities pursuant to the terms

contained in paragraph 13 of the 1931 Agreement. Clifton's representative opposed the Resolution, which reads in part as follows:

WHEREAS, the governing bodies of the Cities of Paterson, Passaic and Clifton have entered into an agreement pursuant to *N.J.S.A.* 40:62–129 for the operation of said waterworks, which provides among other things that Passaic Valley Water Commission shall transmit all monies in its hands from operations beyond what is necessary to meet its obligations, to the Treasurer of the respective Cities in proportion to their ownership in the waterwork; *viz,* in the proportion that the assessed valuation for taxation of all real estate of each of the said Cities for the year 1929, bears to the total assessed valuation for said year of all the real estate in all said Cities; and

WHEREAS, Passaic Valley Water Commission *reasonably anticipates that there shall be a surplus in 1985* as a result of its operation of the waterworks which it operates as aforesaid;

NOW, THEN, BE IT RESOLVED that Passaic Valley Water Commission hereby reports to each of the Cities of Paterson, Passaic and Clifton that it reasonably anticipates that *there will be a surplus in its hands for the year 1985 from the operation of the waterworks for which it is their fiscal agent as aforesaid, in the total amount of $500,000* which they are hereby authorized to include in their respective budgets for the year 1986 as an item of *miscellaneous revenue, under the caption of "Surplus From Passaic Valley Water Commission Operating Surplus Fund" to be transmitted to the three Owner Cities in the following amounts:*

| | | |
|---|---|---|
| Paterson | 59.21% | $ 296,050. |
| Passaic | 27.25% | $ 136,250. |
| Clifton | 13.54% | $ 67,700. |
| | 100.00% | $ 500,000. |

(Emphasis supplied).

Although the ratio of assessed real-estate valuation among the three owner-municipalities has changed since the 1929 standard of valuation incorporated into the 1931 Agreement, the 1929 ratios were used to measure the shares of the distribution to be received by the municipalities in 1986. The 1930 populations and 1929 real property valuations of the owner-cities were:

| City | 1930 Population | 1929 Assessed Valuation of Real Property |
|------|-----------------|------------------------------------------|
| Clifton | 46,875 | 41,941,270 |
| Passaic | 62,959 | 84,331,875 |
| Paterson | 138,153 | 182,111,610 |

Thus, pursuant to paragraph 13 of the 1931 Agreement, the approximate ownership percentages for distribution purposes were fixed as follows: Paterson—4/7ths, Passaic—2/7ths, and Clifton—1/7th.

There have, however, been significant changes in the owner-cities, particularly the City of Clifton, over the past fifty years. Clifton, once a rural farming community, has experienced dramatic rise in population and property values, so that Clifton's population and water consumption are now substantially greater than those of Passaic. In 1986, the residents of the owner-cities consumed water in the following percentages: Paterson—48%, Passaic—20%, and Clifton—32%.[1]

The instant case arose out of three consolidated actions against PVWC, all challenging the resolution distributing $500,-000 from "surplus" to the three owner-cities.[2] The plaintiffs challenged the Resolution and paragraph 13 of the 1931 Agreement as *ultra vires*, violative of the "public trust," and against

---

[1] A more complete summary of the changes in the populations and assessed valuation of real property of the owner-cities is set forth in the trial court's opinion, 224 *N.J.Super.* 53, 58–59 (Law Div.1987).

[2] A verified complaint in lieu of prerogative writ was initially filed on April 29, 1986, by the City of Clifton and Joseph Lynn, City Manager, against PVWC. This complaint was later amended, adding the cities of Paterson and Passaic as defendants. The trial court entered an order on June 30, 1986, requiring all municipalities serviced by PVWC to be joined as plaintiffs or defendants. A second suit was then filed by Senator Joseph Bubba, Totowa's Mayor Samuel Cherba, and Assemblyman Gerald Zecker, and a third action was brought by the Borough of North Arlington and Robert Landolfi. Several other municipalities entered appearances or filed answers. All of them eventually withdrew from active involvement in the case and agreed to be bound by the outcome of the litigation.

sound public policy. They further challenged the PVWC's action as arbitrary, capricious, and unreasonable, inasmuch as at the time of the Resolution's adoption, the Commission had information available to it projecting significant operating losses in 1986 and 1987. Additionally, Clifton sought to declare as invalid paragraph 13 of the 1931 agreement between the owner-cities insofar as it fixed the percentage of ownership among the cities at the ratio established by the 1929 tax assessment of the municipalities.

At trial evidence was presented regarding PVWC's financial status. Both Wendell Inhoffer, General Superintendent and Chief Engineer of PVWC, and James Egan, PVWC's Comptroller and Chief Financial Officer, who worked for PVWC since 1961, testified. Additionally, reports of various consultants to PVWC were admitted into evidence.

In 1984, PVWC adopted a report submitted by a consultant, Havens & Emerson, that recommended that PVWC proceed on a five-year cycle starting in 1985. The report recommended that water rates be raised in the first two years of the cycle to generate surplus, which would be used to offset projected losses in the last two years of the cycle. The projections set forth in its report "did not contemplate a distribution of money to the owner cities." PVWC adopted the report's recommendation and began the five-year plan in 1985. It did so to avoid raising rates on an annual basis. Nevertheless, PVWC, at best, experienced only a small profit of $194,610.45 in 1985 [3] and losses of $1,300,000. in 1986. Comptroller Egan's March 7, 1986, memorandum entitled "Allocation of 12/31/85 Current Funds," while showing available current funds in excess of $6,500,000, estimated projected budget losses of over $4,000,000 with other liability and contingent liability of almost $4,000,000.

---

[3] There is a conflict in the record over profitability for 1985. Comptroller Egan testified that at the end of fiscal year 1985 there was a loss of $211,499.80. The report of the Commission's accountants, the Thieberg report, showed a gain of $194,610.45.

The memorandum further projected substantial losses in 1986 and 1987.

Egan testified that the distribution of April 9, 1986, was premature under the five-year plan. He also indicated that the distributions could not have come out of "surplus" because of these operating losses. Rather, he claimed these funds came out of retained earnings and not from an amount containing a "surplus generated in 1985." Egan further testified that he never had been asked by PVWC or any of the Commissioners whether he endorsed or approved of the $500,000 distribution.

Initially, distributions of $6,000,000 and $2,000,000 were proposed. Superintendent Inhoffer testified that he opposed these distributions, but did, however, inform PVWC that he "could live with" the $500,000 distribution. Edward Routel, the Chief Financial Officer for Passaic, also agreed that there was no surplus at the end of 1985 or 1986, but was of the view that a distribution could be made without hurting PVWC because several million dollars in retained earnings were held by PVWC.

The Commissioner representing Paterson, who recommended the $2,000,000 distribution, which was rejected, requested that an independent auditor be retained to review the question of "surplus." PVWC hired Bowman & Company, which subsequently submitted a report, which stated:

if the projected $4.2 million deficit for 1986 is followed by an equally reasonable deficit of $2.1 million in 1987, such deficits will be absorbed by virtually all of the "consumable" surplus and "available" cash at December 31, 1987. However, this draining of the Commission's funds could create a financial hardship.

The Bowman report went on to conclude that

[i]nasmuch as the projected deficits could exhaust any consumable surplus and available cash at December 31, 1987, deferral of a rate increase too far from the immediate future may be overly prudent.

The trial court voided the distribution, finding that PVWC's action was not authorized by the enabling legislation and was therefore *ultra vires*. It also found that such a distribution was against public policy and violative of the "public trust." Alternatively, it held that the distribution at issue was arbi-

trary, capricious, and unreasonable. It declined to rule on the question of whether the 1931 agreement should be reformed so as to establish a more equitable formula for distribution. Its finding that the distribution was unauthorized rendered this issue moot. The owner-cities were ordered to return the funds distributed to them within sixty days. 224 *N.J.Super.* 53 (Law Div.1987).

PVWC, Paterson, and Passaic filed a notice of joint appeal and were granted a stay of the trial court's order that the funds be returned within sixty days. In an unpublished decision, the Appellate Division affirmed the trial court's judgment on the sole ground that the distribution of "surplus" funds was arbitrary, capricious, and unreasonable, and vacated the stay granted pending appeal.

In their petitions for certification Paterson and PVWC argued that "the lower court rulings are patently unsupported by the evidence" and that "the evidence presented before the trial court clearly and unequivocally justified the action taken by the Commissioners as reflected in the Resolution." The City of Passaic did not file a separate petition but supported the petitions of Paterson and PVWC.

The City of Clifton and Joseph Lynn filed a cross-petition in which they sought review of the Appellate Division's failure to rule that the distribution was *ultra vires* and of the lower courts' refusal to reform the 1931 Agreement so as to establish an equitable-distribution formula.

We granted the petitions and cross-petition. 111 *N.J.* 593 (1988).

## II

▆ PVWC is a creature of the Legislature. Its power, rights, and privileges are derived solely from the statute authorizing its creation. In deciding whether PVWC is authorized to distribute "surplus" funds to its owner-municipalities, therefore, we must construe *N.J.S.A.* 40:62–108 to –150.2.

■ PVWC concedes that the statute does not explicitly authorize the distribution of surplus to the owner-cities. Nonetheless, it contends that authorization for paragraph 13 of the 1931 agreement and the 1986 distribution can be inferred from the enabling statute.[4] Its primary support for this position is derived from language in *N.J.S.A.* 40:62–129 that allows a water commission to provide in its agreement for "the proper management of its financial affairs." PVWC also relies on *N.J.S.A.* 40:62–126 and –127.

We do not agree. Our review of the fundamental public policies underlying the statute, the statutory scheme, and the case law leads us to conclude that paragraph 13 of the 1931 Agreement and the subsequent 1986 Resolution were not authorized by the enabling act. *N.J.S.A.* 40:62–108 to –150 was passed because a "serious water situation exist[ed] in 26 municipalities in this state, which require[d] prompt action to avoid a water famine." Assembly Bill 309 (introduced February 6, 1923) (*L.*1923, *c.* 195, sec. 3) (emphasis supplied).[5] Thus the peculiar nature of the resource "water" mandated that the public have a strong interest in water commissions established under the enabling legislation. *Cf. North Jersey Dist. Water*

---

[4]The term "surplus" is not used in Paragraph 13 of the 1931 Agreement. Instead, in pertinent part, Paragraph 13 provides that "The Commission shall transmit all moneys in their hands acquired from such operation beyond what is necessary to meet its obligations, to the TREASURER of the respective cities in proportion to their ownership in said waterworks * * *." Comptroller Egan testified that in his opinion any distributions made pursuant to paragraph 13 must be made on an annual basis and out of surplus funds earned that year, not from retained earnings from a prior year. Hence, it was his position that PVWC's distribution was not authorized under paragraph 13. We need not decide this issue because we find that paragraph 13 is invalid.

[5]Governor Silzer vetoed this legislation on the ground that further study was required before enacting the law. The Governor shared, however, the Legislature's concern that "[t]he question of supplying water to our municipalities is becoming a most urgent one from day to day," and stated "I believe this water question is the biggest and most important one now facing the people of New Jersey." Governor's Veto of *L.* 1923, *c.* 195, sec. 3, *Assembly Minutes* of 1923, at 862–63.

*Supply Comm'n v. Newark,* 103 *N.J.Super.* 542, 549 (Ch.Div.), *aff'd,* 52 *N.J.* 134 (1968) ("It is, of course, clear that the North Jersey Water District Supply Commission is not a private corporation seeking to make a profit. It is a public body, politic and corporate, exercising public and essential government functions in the interest of the public health and welfare").

PVWC supplies water not only to the residents of the owner-cities but to the residents of twenty non-owner cities. Hence, the public has a legitimate interest in the operation and financial integrity of PVWC. PVWC's rates are essentially unregulated. Unlike a private utility company, PVWC's rates have not been subject to regulation by the Board of Public Utilities. Moreover, the majority of PVWC's consumers do not have the power of a "resident consumer-voter" [6] of a municipal utility company providing services within its boundaries. This is the power to, if he or she "does not like the management or the rates, ... vote the governing body out of office, and.... achieve reform." *Meglino v. Township Comm. of Eagleswood,* 103 *N.J.* 144, 152 (1986) (citing *In re Complaint by Township of Morris,* 49 *N.J.* 194, 204 (1967)). "That voter control is lacking when a municipal utility extends its services to residents in adjoining municipalities." *In re Township of Morris, supra,* 49 *N.J.* at 204–05.

Indeed, we recognized in *Township of Morris* that the Legislature would not intentionally protect consumers of private water companies and leave non-resident consumers of municipal water companies without any protection. *Id.* at 205. The public's interest and the unregulated nature of PVWC's operation lead us to conclude that the legislature intended the powers and authority given to water commissions under the statute to be strictly construed. This restrictive interpretation of the

---

[6] In 1985 34% of all the water sold by PVWC was supplied to the residents of non-owner cities, and 32% of the remaining share of water went to the residents of Clifton. Under the voting provisions of PVWC set forth in the 1931 Agreement Clifton has only one Commissioner on the PVWC.

enabling legislation imposes restraints on the operation and rates of PVWC and protects PVWC customers.

The statutory scheme likewise supports a "strict" interpretation of the powers of PVWC under the enabling legislature. Indeed, an examination of the statutory provisions PVWC relies on to support its liberal interpretation of the enabling legislation discloses the detailed and strict control the Legislature imposed on water commissions. *N.J.S.A.* 40:62–127 provides in part that

> *rates shall be prescribed,* and shall be revised from time to time whenever necessary, *so that the waterworks shall be self-supporting,* the earnings to be sufficient to provide for all expenses of operation and maintenance and such charges as interest, sinking fund and amortization, *so as to prevent any deficit to be paid by taxation from accruing.*

(Emphasis supplied).[7]

*N.J.S.A.* 40:62–129 concerns the authority of the governing bodies of the municipalities to "enter into an agreement prescribing a method of electing or appointing a commission to succeed the commission appointed" pursuant to *N.J.S.A.* 40:62–109. More importantly for this case, Section 129 further provides:

> The agreement so made shall specify the number of persons to constitute the commission, their term or terms of office, method of organization, and powers, duties and compensation ... Such agreement shall also provide for the appointment or election of a secretary, treasurer, and such other officers as may be necessary, and prescribe their duties and compensation, *and contain such other provisions as may be necessary for the maintenance and efficient operation of such waterworks, the extension and enlargement thereof, and the proper management of its financial affairs;* and may be amended from time to time. (Emphasis supplied).

---

[7]Paragraph 16 of the 1931 Agreement paraphrases Section 127.

"16. The Commission shall prescribe proper rates for water and revise the same from time to time whenever necessary, so that the water works shall remain self-supporting, the earnings at least to be sufficient to provide for all expenses of operation and maintenance, and such charges as interest, sinking fund, and amortization so as to prevent any deficit to be paid by taxation from accruing."

Other provisions disclosing the specificity with which the Legislature addressed concerns bearing on the financial operation of the commission, include *N.J.S.A.* 40:62–117 ("[a]ll expenses subsequently incurred for operating the waterworks and all other expenses and charges not properly chargeable to capital shall be paid or satisfied out of earnings"); *N.J.S.A.* 40:62–121 (municipalities may issue bonds to finance cost of acquiring such waterworks); *N.J.S.A.* 40:62–126 (municipalities may borrow money to finance enlargement and extension of waterworks, however, "not exceeding the amount of funds other than such proceeds theretofore expended by the commission * * * for such enlargements, extensions or improvements"); *N.J.S.A.* 40:62–128 (commission created under this law may sell any part of its property not needed for public use, however, "proceeds of any sale * * * shall be used and applied only in payment of the principal of the unpaid bonds, if any, theretofore issued for the acquisition or enlargement or extension of the waterworks"); *N.J.S.A.* 40:62–133 (commission created pursuant to section 40:62–129 may "acquire by condemnation, purchase, lease or agreement any property, * * * necessary or convenient for the operation, maintenance or enlargement of [ ] waterworks [ ]"); *N.J.S.A.* 40:62–136 (Commission must advertise for bids for contracts in excess of $2,500); and *N.J.S.A.* 40:62–137 (terms of proper execution of contract by Commission are set forth). The explicit language of these provisions contrasts sharply with the absence of any statutory authorization to distribute surplus if the Legislature approved of that practice. PVWC's ability to distribute its "surplus" funds to its member municipalities cannot be reasonably inferred from the statutory scheme.

In addition, the Legislature explicitly stated that a portion of the enabling act for waterworks owned by two or more municipalities should be liberally construed in favor of such commissions. *N.J.S.A.* 40:62–148 states that

[t]he commission may adopt all ordinances and resolutions, enter into all agreements and contracts, and do any and all other acts and things necessary to

provide water for the public and private uses of its customers in accordance with the provisions of sections 40:62–133 to 40:62–150 of this title.

This mandate, however, concerns only the latter segment of the statutory scheme. It is not controlling with respect to Sections 126, 127, and 129. Had the Legislature intended the Commission to enter into "agreements and contracts, and do any and all other acts and things necessary" to implement these Sections, it would have promulgated a less-circumscribed mandate for liberal construction. *Cf. Boyle v. DeNooyer,* 39 *N.J.* 245, 248 (1963) (the power of the Board of Commissioners of the City of Passaic to appoint Passaic's commissioner to the PVWC not to be inferred from Section 129).

We are unpersuaded by the defendant's argument that authorization for the distribution of surplus may be derived from *N.J.S.A.* 40:62–126, which allows PVWC to issue bonds and provides that "said bonds shall constitute debt incurred by ... [the] municipality." Inasmuch as the bonds are guaranteed by the owner-cities and the owner-cities are responsible for deficits of the PVWC, the defendants urge that owner-cities should be entitled to distribution of "surplus" to compensate for these responsibilities. First, the owner-cities have never been required to expend any funds on behalf of the waterworks. Moreover, the owner-cities receive substantial benefits for guaranteeing the bonds. "They have priority of supply as against non-member municipalities and water companies, and must also have priority of rates." *Clifton v. Passaic Valley Water Comm'n,* 59 *N.J.Super.* 87, 92 (Ch.Div.1960). The 1960 amendment to *N.J.S.A.* 40:62–127 reflects the Legislature's desire that the owner-cities be permitted to receive additional benefits as compensation for the assumption of the burdens of ownership. This amendment added the following sentence to Section 127: "The supplying of water to locations beyond the boundaries of the municipalities owning the waterworks shall be basis for separate classification of service to permit reasonable differentiation of rates." *L.*1960, *c.* 172. The following proclamation accompanied this amendment:

The purpose of this bill is simply to clarify the law permitting a commission to charge somewhat higher rates to consumers outside the owner municipalities in cases where the investment or tax liability of owner municipalities or other factors make such a differential reasonable in the circumstances. [*Statement to A-715; see Curtiss Wright Corp. v. Passaic Valley Water Comm'n*, 89 *N.J.Super.* 111, 114 (App.Div.) *certif. den.*, 46 *N.J.* 136 (1965).]

Accordingly, under the current statute, the authority to charge non-owner cities a reasonably differentiated rate so that they pay higher rates for their water than the residents of the owner-cities is deemed an ample benefit to compensate for the risks of ownership.

Indeed, not only are we unpersuaded by PVWC's argument that authorization for the distribution of surplus is to be inferred from the statutory scheme, but we conclude that the language of the statute itself compels the contrary inference. *N.J.S.A.* 40:60–127 mandates that "the waterworks shall be self-supporting ... so as to prevent any deficit to be paid by taxation from accruing." This provision calls for retention of earnings to offset future deficits. We also note that without any restrictions imposed on PVWC it could arguably raise rates in order to subsidize the taxpayers of the owner-cities at the expense of Clifton and its non-resident consumers. We recognized this danger and voiced concern about it in *In re Township of Morris, supra*, 49 *N.J.* at 204–07.

Just as the public policy underlying the enabling statute and legislative scheme dictates that authority for the $500,000 distribution ought not be inferred from Sections 126, 127, and 129, so too persuasive case precedent mandates that paragraph 13 of the 1931 Agreement be invalidated. Although there are few reported decisions interpreting this statute, cases interpreting other municipally-owned entities are analogous and instructive.

In *Driscoll v. Burlington–Bristol Bridge Company*, 8 *N.J.* 433, *cert. den.*, 344 *U.S.* 838, 73 *S.Ct.* 25, 97 *L.Ed.* 652 (1952), we addressed the question of "the right of a bridge commission to operate at a profit, and specifically, the right of the Burlington County Bridge Commission to operate for profit ... two

142

interstate bridges...." 8 *N.J.* at 489–90.[8] We reasoned as follows:

> A bridge commission is a body both corporate and politic. Its creation by the board of chosen freeholders of a county is authorized by the "Self–Liquidating Bridges Act," R.S. 27:19–26 *et seq.*, as amended. *In many respects it has a standing analogous to that of a municipal corporation and derives its power and authority to act solely from statute * * *. Like a municipal corporation it enjoys a considerable degree of discretion as to the manner in which it carries out the functions committed to it, but unlike "municipal corporations formed for local government" which by art. 4 § 7, par. 11 of the [New Jersey] Constitution of 1947 are entitled to have statutes concerning them "liberally construed in their favor," the statutory powers of a bridge commission are to be strictly construed and any doubt or ambiguity is to be resolved against it. An examination of the various statutes pertaining to bridge commissions fails to disclose any provision from which it can reasonably be inferred that they have the power to operate bridges for profit.* Rather, from the fact that the powers of bridge commissions are spelled out in some detail in the statutes without mention of the right to make a profit and also from the fact that the entire statutory scheme is designed towards making the bridges "self liquidating," it clearly was not the legislative intent to give bridge commissions such power. [*Id.* at 490 (citations omitted) (emphasis supplied).]

In holding that a bridge commission was not authorized to operate for profit, we reasoned that "[n]o mention whatever is made of providing a profit for the enrichment of a county," and "[m]oreover, in view of the fact that a bridge commission is empowered by [the statute] to acquire intercounty and interstate bridges, it would be unjust to infer that one county could profit at the expense of, and out of the property located in part in another county or state." *Id.* at 490–91. We concluded that the Bridge Commission possessed no authority to make the profit and was without power to make contemplated payments in lieu of taxes to the municipalities involved. *Ibid.* With respect to the latter, we stated that *"[t]he making of such*

---

[8]*Driscoll* construed *N.J.S.A.* 27:19–32, which provided:

The rate of tolls to be charged * * * shall be so fixed and adjusted as to comply with any contract or agreement of the commission relative thereto and, in any event provide a fund sufficient to pay the interest and principal of any bonds issued under this Title, and to provide an additional fund to pay the cost of maintaining, repairing and operating such bridges.

*payments by the bridge commission in the absence of statutory authorization would constitute an unlawful diversion of toll revenues, whereas previously pointed out the powers of a bridge commission are derived wholly from statute."* Id. at 491 (emphasis supplied).

The *Driscoll* rationale is equally applicable to the case at bar. *Driscoll*, like this case, addresses the question of the authority of an entity like PVWC to operate at a profit, and the question of whether that entity may make payments "in lieu of taxes" to the owner-municipalities involved. *Driscoll, supra,* 8 *N.J.* at 491. In *Driscoll* and in the case at bar, the enabling statute does not expressly authorize such a practice. We held there as we do here that the bridge commission, like PVWC, is dissimilar to a municipal corporation formed for local government and thus not entitled to have statutes concerning it liberally construed in its favor. Rather, their powers "are to be strictly construed and any doubt or ambiguity is to be resolved against it." *Id.* at 490. In addition, we recognize "the fact that the powers of [the] commission are spelled out in some detail in the statutes without mention of the right to make a profit and also [ ] the fact that the entire statutory scheme is designed towards making" the PVWC "self-supporting." *Ibid.; see N.J.S.A.* 40:62–127. This indicates that "it clearly was not the legislative intent to give [water] commissions such power." *Driscoll, supra,* 8 *N.J.* at 490.

We find the defendants' reliance on *H.P. Higgs Company v. Madison,* 188 *N.J.Super.* 212 (App.Div.), *certif. den.,* 94 *N.J.* 535 (1983), to be misplaced. In *Madison,* plaintiff, a New Jersey corporation with offices in Madison, challenged Madison's practice of transferring surpluses incurred from its utility to its general fund. The Appellate Division found that the trial court erroneously "perceived that defendant could not operate the utility so as to create intentionally surpluses for the purposes of transfer of funds to its general fund." *Id.* at 225. Contrary to the plaintiff's assertion, the Appellate Division found that *"a budget that generates surplus is not inconsist-*

*ent with the purposes of the Local Budget Law. Indeed, the Legislature contemplated that surpluses could be intentionally created."* Madison, supra, 188 N.J.Super. at 226 (emphasis supplied).

Hence, the *Madison* court relied on explicit statutory authorization for distribution from surplus. Moreover, that statutory provision (*N.J.S.A.* 40A:4–35), along with the *Madison* case, are applicable only to utilities owned by a single municipality. *N.J.S.A.* 40A:4–33 to –35; *cf. Fivehouse v. Passaic Valley Water Comm'n,* 127 *N.J.Super.* 451, 455–56 (App.Div.) (employee of PVWC not protected by provisions of *N.J.S.A.* 40A:9–5, which applies to employees of municipal and county governments), *certif. den.,* 65 *N.J.* 565 (1974).

Likewise, the *Madison* court, relying on *In re Township of Morris, supra,* 49 *N.J.* at 204–07, based its holding on its perception of the ability of the political process to minimize rate abuses by a municipal utility providing services within its own boundaries.

> *[T]he action of a municipality in setting rates is subject to the political power of the electorate to change the governing body if the* electorate is dissatisfied with the rates set. * * * *Here the potential of the political process to correct abuses in defendant's rate structure is evident.* Defendant is the sole supplier of electricity within its boundaries. Thus we may reasonably presume that charges for electrical service are paid by or on behalf of every resident and every voter in Madison. Yet *the electorate has not caused the governing body to change the rate structure to eliminate surpluses.* [*Madison, supra,* 188 *N.J.Super.* at 222–23 (citations omitted) (emphasis supplied).]

In the instant case, such an ability does not exist. As noted, twenty non-owner cities are served by PVWC; they account for approximately one-third of its annual water sales. Moreover, PVWC is, pursuant to the 1931 Agreement, made up of four commission representatives, only one of whom is a representative of Clifton. Unlike the situation in *Madison,* the majority of PVWC consumers, Clifton and the non-owner consumers, cannot "vote out" the governing bodies of Paterson or Passaic or the members of the PVWC. The need for protection of the local consumers, therefore, is compelling, for they are effective-

ly precluded from correcting rate abuses without instituting a legal act.

In sum, we hold that the fundamental public policy behind the statute, the statutory scheme of PVWC's enabling Act, and persuasive precedent dictate that paragraph 13 of the 1931 Agreement be invalidated. Indeed, the Legislature responded to the *Madison* case by enacting *N.J.S.A.* 40A:4–35.1., *L.*1983, *c.* 111, which states that

[t]o the extent there is available surplus revenue collected by a municipality pursuant to chapter 62 of Title 40 of the Revised Statutes for supplying a utility service which is regulated by the Board of Public Utilities pursuant to R.S. 40:62–24 or section 1 of P.L.1975, c. 184 (C. 40:62–85.2), an amount not to exceed 5% of the annual costs of operation of the utility may be transferred annually from the accounts of the municipal utility and included in the local budget pursuant to *N.J.S.* 40A:4–35.

As the Legislature noted, this "bill goes beyond [*Madison*], in that the decision dealt solely with services provided within municipal boundaries, while [it] concerns services provided both within and outside those boundaries." *Statement to S. 1317. N.J.S.A.* 40A:4–35.1 indicates that the Legislature may allow a Commission which serves consumers situated outside of its own boundary to make such distributions. However, it is significant that the Legislature deemed that any distribution of surplus needed to be explicitly authorized and specifically limited. We cannot, then, infer from the enabling legislation any authority either implicitly or explicitly, for PVWC to distribute funds to its owner-cities pursuant to paragraph 13 of the 1931 Agreement.

### III

The trial court concluded that the resolution authorizing the 1986 distribution was arbitrary, capricious, and unreasonable for the following reasons:

1. No surplus existed.

2. Comptroller Egan's March 1986 memo showed a negative total of $1,250,000 projected for 1986 with a further projected loss of $2,500,000 in 1987.

3. Comptroller Egan's interoffice memo to the Commission dated January 15, 1986 projected that 1985 will generate a loss figure between $600,000 and $750,000 and 1986 will be in excess of $1,000,000.

4. The report of the Commission's accountants dated February 28, 1986 (Thieberg report) shows a 1985 loss of almost $200,000.[9]

5. The independent auditor's report (Bowman & Co.) concluded that projected deficits will use all consumable surplus and available cash.

6. The distribution violated the intent and purpose of the Commission's own five-year plan then in effect.

7. The Commission failed to request the advice or recommendation of its comptroller and chief financial officer. [224 *N.J.* at 53.]

In view of our invalidation of paragraph 13 of the 1931 Agreement, it is not essential for us to reach the question of whether the 1986 distribution of $500,000 was arbitrary, capricious, and unreasonable. Nonetheless, we agree with the Appellate Division's findings that adequate, substantial, and credible evidence support the trial court's invalidation of the distribution on this ground. *See Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 484 (1974).

## IV

Our final task is to decide whether the funds dispersed by PVWC in 1986 [10] are to be returned by the owner-cities.

Although the Appellate Division vacated the stay of the trial court's order requiring the owner-cities to return the funds distributed in 1986, none of the owner-cities has returned the distributed funds. We recognize that the owner-cities in the instant case have received much-needed funds from the distributions. In reliance on their receipt of these funds they have forgone other revenue-raising measures. Moreover, their reliance on the distribution of funds was not entirely unreason-

---

[9]The trial court erroneously found that the Thieberg report showed a 1985 loss of almost $200,000. That report showed a gain of $194,610.45. Comptroller Egan, however, did testify that PVWC lost $211,499.80 in 1985.

[10]None of the prior distributions has been challenged. Accordingly, they will not be disturbed.

able, in light of the prior, uncontested distributions of funds. Therefore, although we do find that the 1986 distribution must be returned, we permit the owner-cities and the PVWC to determine the terms and conditions of a repayment schedule.

## V

In summary, we hold that paragraph 13 of the 1931 Agreement is invalid because there is no legislative authorization for distribution of funds from PVWC's surplus to the owner-cities.

As modified, the judgment of the Appellate Division is affirmed.

O'HERN, Justice, dissenting.

Over fifty years ago, the three towns of Paterson, Passaic, and Clifton invested their capital in a public water works, the Passaic Valley Water Commission (PVWC). (I refer to them generally as towns, although each is an incorporated city.) The Commission sells some of its water to other towns as customers, but the founder towns run all the risks of loss. *Their citizens* are exposed to the consequences of catastrophic losses. *N.J.S.A.* 40:62–115.

Over the years, the three towns have shared the benefits and burdens of the works. They have pledged the credit of their tax base to improvements in the water works. As a result of such improvements, their water system has, we are told, the lowest water rates in northern New Jersey.

Setting water rates is an annual exercise in predicting consumption, costs, and often the unexpected in the form of drought or surplus water. On occasions, water revenues will exceed expenses. For over thirty years when excess revenues had been available, the three towns shared in the modest surpluses of the well-managed utility. Distributions were made to owner-municipalities pursuant to their agreement on the following basis: 1952—$150,000, 1953—$125,000, 1957—$100,-

000, 1962—$350,000, 1984—$700,000, 1985—$375,000, 1986—$500,000.

In accordance with that long-standing practice, their agency, the PVWC, by resolution dated April 9, 1986, authorized the distribution of $500,000 in surplus funds to the owner-municipalities in accordance with the formula set forth in their agreement as follows: Paterson—$296,050, Passaic—$136,250, and Clifton—$67,700.

The Court holds now that this distribution, and implicitly all the prior distributions, were unauthorized by law. Given the proper function of courts in regard to the separation of governmental functions, I am unable to agree that the distribution of profits exceeds the exercise of the Commission's power.

I

The PVWC was created pursuant to *L.* 1923, *c.* 195 (codified as amended at *N.J.S.A.* 40:62–108 to –150.2). In 1931, pursuant to the Act, the governing bodies of Paterson, Passaic, and Clifton applied to the New Jersey Supreme Court (then a trial-level court) for the appointment of a commission to acquire the water works and distribution system of a private water company, the Passaic Valley Water Company. The court appointed the Commission and the works were acquired. The statute authorized the three towns to enter an agreement with respect to the conduct of its operations. *N.J.S.A.* 40:62–129. The terms of the 1931 agreement provide that the PVWC is governed by four commissioners. Paterson has two representatives on the Commission while Passaic and Clifton each have one representative. Additionally, the terms of the agreement specifically authorized the proposed distribution of surplus from the PVWC revenues to the three municipalities.

But the Law Division was of the view that to operate a municipal utility at a profit "is anathema to the public interest." Does it follow that a deficit is in the public interest? Of course not. The legislation authorizing the creation of such a water

utility provided that as soon as practicable rates should be established so that the water works shall be self-supporting, "so as to prevent any deficit to be paid by taxation from accruing." *N.J.S.A.* 40:62–127. Given the unpredictability in the rate-setting process, it would be almost impossible to strike a rate that would evenly balance expenses and revenues every year.

Accordingly, paragraph 13 of the agreement between the three towns provides that the Commission "shall transmit all monies in their hands acquired from such operations beyond what is necessary to meet its obligations, to the TREASURER of the respective cities in proportion to their ownership in said water works." The municipalities' percentages of ownership were set forth in the agreement on the basis of their then-existing ratables, which were as follows:

| City | 1930 Population | 1929 Assessed Valuation of Real Property |
|------|-----------------|------------------------------------------|
| Clifton | 46,875 | 41,941,270 |
| Passaic | 62,959 | 84,331,875 |
| Paterson | 138,153 | 183,111,610 |

As we know, over the years the population of the member towns has changed so that at the present time the assessed valuation of property in Clifton exceeds the combined assessment of property in Paterson and Passaic. Although that is not a legally-determinative factor in this case, it is undoubtedly the driving force behind the litigation. The question is whether the changed demographics affect the judicial role in this matter. I think they do not and that we are bound to adhere to fundamental principles of judicial review of municipal authorities.

## II

Courts have but a limited role in reviewing the actions of other branches of government. *See Dougherty v. Department of Human Servs.*, 91 *N.J.* 1, 12 (1982) ("[C]ourts are not free to substitute their judgment as to the wisdom of a particular

administrative action for that of the agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable."). Thus we generally recognize that an agency charged with the implementation of a statutory program must have a broad range of discretion to implement the program even when there is no express direction on the issue. *See id.* at 6. Hence the Commission's decision how best to run its water works should be and is entitled to judicial deference until it is shown plainly to conflict with the goals of the 1923 legislation.

*N.J.S.A.* 40:62–116 specifically provides that property acquired by a commission created under the act shall be the property of the municipalities constituting the commission. Although the Commission takes title to the water works when the works are purchased or condemned, "the commission is nothing but an agency of the municipalities that are engaged in the enterprise." *Carr v. Borough of Merchantville,* 102 *N.J.L.* 553, 557 (Sup.Ct.1926). Thus, in both form and substance the water commission must be considered as analogous to a municipal corporation. It is thereby entitled to the liberal interpretation of statutory provisions accorded to municipal corporations. This right is guaranteed by the New Jersey Constitution:

> The provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties, shall be *liberally construed* in their favor. The powers of counties and such municipal corporations shall include not only those granted in express terms but also those of *necessary or fair implication,* or *incident to the powers expressly conferred,* or essential thereto, and not inconsistent with or prohibited by this Constitution or by law.
>
> [*N.J. Const.* of 1947, art. IV, sec. VII, para. 11 (emphasis added).]

The majority is unable to find the authority in the enabling legislation for the section of the municipal agreement that authorized the distribution of excess resources to the member towns, paragraph 13. Our predecessors in government bequeathed us statutes lean in their outline (was it the absence of word-processors?) but sufficient to the unfolding needs of society. It is well to consider in that light the terse provisions of the

statute as originally enacted. The entire act is but seven pages in the Session Laws. *L.*1923, *c.* 195, 1923 N.J.Laws 504–10. The legislation specifically authorized the municipalities to include in their agreement to operate a joint public water works "such other provisions as may be necessary for the maintenance and efficient operation of such water works, the extension and enlargement thereof, and the proper management of its financial affairs." *N.J.S.A.* 40:62–129. The absence of prolixity should be a cause for satisfaction, not hand-wringing.

It is, in my opinion, too narrow a view of municipal power to hold that paragraph 13 of the contract provision was beyond the "necessary or fair implication" of the power afforded, or unrelated to the "powers expressly conferred" on the municipalities. *N.J. Const.* of 1947, art. IV, sec. VII, para. 11.

The Legislature has recognized that the substantial burdens undertaken by the member municipalities require a broad sweep to their agency's powers. The 1960 amendment to *N.J.S.A.* 40:62–127 specifically allowed utilities like PVWC to charge higher rates to outside municipalities. The Statement accompanying the bill declared:

> The purpose of this bill is simply to clarify the law permitting a commission to charge somewhat higher rates to consumers outside the owner municipalities in cases where the investment or tax liability of owner municipalities or other factors makes such a differential reasonable in the circumstances.
>
> [Statement to *L.* 1960, *c.* 172 (Jan. 5, 1961), *quoted in Curtiss–Wright Corp. v. Passaic Valley Water Comm'n*, 89 *N.J.Super.* 111, 114 (App.Div.), *certif. den.*, 46 *N.J.* 136 (1965).]

All we need ask is whether PVWC's actions were reasonable under the circumstances. The General Superintendent and Chief Engineer of PVWC, although not enthused about the distribution, was of the view that it would be beneficial to the proper management of PVWC's financial affairs by demonstrating its responsiveness to the needs of the member municipalities.

Conceptually, we must ask as well how this situation would be handled if a single municipality were operating the water works and serving multiple customers. If in a given year

revenues exceeded costs, we would not hold that they must be restored to customers or not deposited in the general treasury, assuming proper compliance with the local budget law, *N.J.S.A.* 40A:4–1 to –87 (*N.J.S.A.* 40A:4–35.1 limits surplus revenue transferred to a municipality so as not to exceed five percent annual costs of the operation of the utility). This is the holding of *H.B. Higgs Co. v. Borough of Madison*, 188 *N.J.Super.* 212 (App.Div.), *certif. den.*, 94 *N.J.* 535 (1983). In *H.B. Higgs Co.*, ratepayers primarily objected to Madison's earning a surplus from its rates charged for its electric utility operations. *Id.* at 215. The trial court had invalidated as being unreasonable an ordinance that allowed the transfer of surplus revenues generated from the utility to the municipality's general fund. *Id.* at 221. The Appellate Division reversed. It found that "a budget that generates surpluses is not inconsistent with the purposes of the Local Budget Law," which in fact provided for anticipated surpluses. *Id.* at 226 (citing *N.J.S.A.* 40A:4–23, –32(f), –34, –35). Recognizing that such ordinances "will be upset only if patently unreasonable," it upheld the municipality's ratemaking ordinance as valid. *Id.* at 222. The court added that if the ratepayers of Madison were dissatisfied with their bills, "their remedy is through the political process." *Id.* at 228. Thus, the Appellate Division held that it was not a violation of statutory authority for the municipality to operate its electric plant in such a way as to yield a surplus in certain years. *Ibid.*

The majority distinguishes *Higgs* because the customer members and the constituent members cannot exert political power to vote the management of the PVWC out of office. But the political process can work here. The customer-municipalities are quite free to purchase water from any other source. All of northern New Jersey is interconnected for that purpose. In fact, the customers are exercising their choice by buying water at the lowest available prices in the northern New Jersey metropolitan area.

The constituent-municipalities have a trump card in that if they refuse to participate in the further pledge of their collat-

eral, the bonding capacity of the PVWC would be severely limited. (Statutory authority binds the member municipalities to the issuance of bonds only for the purpose of acquisition or construction of property for the water works. *N.J.S.A.* 40:62–121, –133.)

In short, the political process is quite capable of solving this situation. It is somewhat disturbing that the demographics of the constituent towns have changed so substantially, but when it reaches a breaking point, the population of two-thirds of the members can change the situation. And there is a *quid pro quo* : presumably, any losses incurred from the acquisition of the water works would have to be borne in accordance with the formula. *See N.J.S.A.* 40:62–115 (municipality that withdraws from an agreement is still liable for its proportion of expenses paid or debts incurred by the Commission).

Finally, I note that the majority does not predicate its decision on the determination that the municipal action was "patently unreasonable," although it states somewhat in dictum that it agrees with that portion of the judgment of the Appellate Division. Were that to be the basis of the Court's decision, I would be unable to agree with it. There is simply no basis for concluding that this distribution in any way endangered the financial stability of PVWC. As noted, its General Superintendent agreed with it. The Chief Financial Officer, on whose testimony the lower courts predicated their decisions, seems to have mistakenly interchanged capital accounts with operating accounts. For example, at the end of the year 1985, the PVWC had $1.5 million in operational surplus. That is how healthy the utility is. The utility then proceeded to make capital acquisitions of $1.7 million which creates the paper deficit of $200,000. Proper accounting practices would never consider a capital acquisition of that nature to demonstrate that the utility was operating at a deficit. In 1986, the alleged $1.3 million loss was again after capital acquisitions and was also incurred because a projected rate increase had been delayed as a result of this litigation. In short, this is a well-operated water utility with

earned surplus in the year of 1986 well in excess of this $500,000 distribution to the constituent municipalities.

We would do well to let the political process correct any problems in the defendant's rate structure. This utility has done extremely well without courts managing its affairs.

*For modification and affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6.

*For reversal*—Justice O'HERN—1.